PILLSBURY WINTHROP SHAW PITTMAN LLP
PAUL J. FRAIDENBURGH (280354)
DYLAN M. ASTE (281341)
FRANCIS T. KALINSKI (360576)
11682 El Camino Real, Suite 200
San Diego, CA 92130
Telephone: 858-509-4000; Facsimile: 858-509-4010
Email: paul.fraidenburgh@pillsburylaw.com
dylan.aste@pillsburylaw.com
frank.kalinski@pillsburylaw.com

PILLSBURY WINTHROP SHAW PITTMAN LLP
CHRISTOFFER LEE (280360)
2400 Hanover Street
Palo Alto, CA 94304
Telephone: 650-233-4500; Facsimile: 650-233-4545
Email: christoffer.lee@pillsburylaw.com

Attorneys for Defendant LAURIE HOLCOMB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *ex rel.* AIDAN FORSYTH,

Plaintiffs,

v.

GOLD FLORA LLC, GF DISTRIBUTION LLC, GOLD FLORA PARTNERS LLC, BLACK LION FARMS LLC, and LAURIE HOLCOMB,

Defendants.

Case No. 3:23-cv-01962-W-MMP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LAURIE HOLCOMB'S MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 12(b)(3) OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

Date: October 12, 2026
Judge: Hon. Thomas J. Whelan
Courtroom: 3C

**NO ORAL ARGUMENT PER LOCAL RULE UNLESS FURTHER**

**ORDERED BY THE COURT**

Complaint Filed: July 8, 2026
Trial Date: None Set

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 2

A. The Gold Flora Companies are formed and immediately register with the federal Government .......... 2

B. COVID-19 shuts down the country, and the Gold Flora Companies are deemed essential businesses to continue operating to "protect the health and well-being of all Californians." .......... 2

C. The Government establishes the PPP program, and the Gold Flora Companies avail themselves to PPP funds to keep themselves and their employees afloat. .......... 3

III. LEGAL STANDARDS .......... 5

A. Rule 12(b)(3) .......... 5

B. Rule 12(b)(6) .......... 6

IV. ARGUMENT .......... 7

A. Venue is improper because this case has no meaningful connection to the Southern District of California. .......... 7

1. Ms. Holcomb cannot be "found" in this District. .......... 8

2. Ms. Holcomb does not reside in this District. .......... 9

3. Ms. Holcomb does not transact business in this District. .......... 9

4. Ms. Holcomb is not alleged to have made any false claim in this District. .......... 11

B. All counts must be dismissed because the alleged misrepresentations were not material to the Government. .......... 11

1. The Government has not sufficiently pled that the Legality Certification was material. .......... 12

a. The Legality Certification did not go to the "essence of the bargain." .......... 14

b. The Government knowingly issued PPP loans to cannabis businesses. .......... 15

2. The Government has not sufficiently pled that Ms. Holcomb's Ownership Certification was material. .......... 18

C. Count IV must be dismissed for an independent reason: The Government failed to allege that Ms. Holcomb herself—not the Gold Flora Companies—benefitted from any "unjust enrichment." ........ 20

D. The alleged Legality and Eligibility Certifications are non-actionable legal representations and, therefore, cannot support an FCA claim. ........ 21

E. The Government also fails to plead a reverse false claim (Count III) with particularity, because the Complaint fails to allege a specific legal obligation to pay. ........ 24

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
260 F. Supp. 2d 941 (N.D. Cal. 2003) .......... 20

*Am. Textile Mfrs. Inst. v. The Ltd., Inc.*,
190 F.3d 729 (6th Cir. 1999) .......... 25

*Amateur-Wholesale Elecs. v. R. L. Drake Co.*,
515 F. Supp. 580 (S.D. Fla. 1981) .......... 8

*Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*,
793 F.3d 991 (9th Cir. 2015) .......... 11

*United States ex rel. Animal Legal Def. Fund v. Holden Farms, Inc.*,
2024 WL 2728451 (D. Minn. May 24, 2024) .......... 13, 14, 15, 16

*Argueta v. Banco Mexicano, S.A.*,
87 F. 3d 320 (9th Cir. 1996) .......... 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 7

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
571 U.S. 49 (2013) .......... 5, 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6, 7

*United States ex rel. Berg v. Honeywell Int'l, Inc.*,
226 F. Supp. 3d 962 (D. Alaska 2016), *aff'd,* 740 F. App'x 535 (9th Cir. 2018) .......... 22, 23

*Bolos v. Waldorf=Astoria Mgmt. LLC*,
762 F. Supp. 3d 975 (D. Haw. 2025) .......... 22

*U.S. v. Bourseau*,
531 F.3d 1159 (9th Cir. 2008) .......... 24, 25

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011) ........ 7

*United States ex rel. Cain v. Salish Kootenai Coll., Inc.*, 862 F.3d 939 (9th Cir. 2017) ........ 14

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016) ........ 24

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ........ 7

*United States ex rel. Dunn v. LTC Acct. Servs., LLC*, 2026 WL 800969 (E.D. Okla. Mar. 23, 2026) ........ 18

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) ........ 9

*Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004) ........ 7

*United States v. Evans*, 929 F.3d 1073 (9th Cir. 2019) ........ 23

*Gaudin v. Remis*, 379 F.3d 631 (9th Cir. 2004) ........ 9

*United States v. Hemani*, 146 S. Ct. 1677 (2026) (Alito, J. concurring) ........ 23

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996) ........ 19

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048 (9th Cir. 2007) ........ 7

*Jensen v. Maryland Cannabis Admin.*, 719 F. Supp. 3d 466 (D. Md. 2024), *aff'd,* 151 F.4th 169 (4th Cir. 2025), *cert. denied,* 146 S. Ct. 1626 (2026) ........ 23

*Johnson v. Ross*, 419 F. App'x 357 (4th Cir. 2011) ........ 20

*King v. Vesco*,
342 F. Supp. 120 (N.D. Cal. 1972) ..... 8

*Kreidler v. Pixler*,
2010 WL 11527333 (W.D. Wash. Aug. 3, 2010), *aff'd,* 482 F. App'x 204 (9th Cir. 2012) ..... 20

*Le Vecke v. Griesedieck W. Brewery Co.*,
233 F.2d 772 (9th Cir. 1956) ..... 10

*In re Malul*,
614 B.R. 699 (Bankr. D. Colo. 2020) ..... 23

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ..... 6

*United States ex rel. Mei Ling v. City of Los Angeles*,
389 F. Supp. 3d 744 (C.D. Cal. 2019) ..... 12

*Miller v. Yokohama Tire Corp.*,
358 F.3d 616 (9th Cir. 2004) ..... 21, 22

*Naoom v. Secured Assets Income Funds*,
2006 WL 8455409 (S.D. Cal. Oct. 16, 2006) ..... 22

*United States ex rel. Ormsby v. Sutter Health*,
444 F. Supp. 3d 1010 (N.D. Cal. 2020) ..... 24

*Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*,
291 F. Supp. 252 (E.D. Pa. 1968) ..... 8

*Piedmont Label Co. v. Sun Garden Packing Co.*,
598 F.2d 491 (9th Cir. 1979) ..... 6

*Puri v. Khalsa*,
674 F. App'x 679 (9th Cir. 2017) ..... 20

*United States ex rel. Quesenberry v. JMG Invs., Inc.*,
2026 WL 453469 (C.D. Cal. Jan. 14, 2026) ..... 20

*United States v. Scophony Corp. of Am.*,
333 U.S. 795 (1948) ..... 9, 10

*United States ex rel. Sidesolve LLC v. Docklight Brands, Inc.*, No. 2:22-cv-01371-JNW (W.D. Wash.) .......... 17

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) .......... 7

*United States ex rel. Schutte v. SuperValu*, 598 U.S. 739 (2023) .......... 21, 22

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) .......... *passim*

*Williams v. Canon, Inc.*, 432 F. Supp. 376 (C.D. Cal. 1977) .......... 9

Statutes and Codes

United States Code
Title 15, Section 22 .......... 8, 9
Title 18, Section 922(g)(3) .......... 23
Title 18, Section 1965 .......... 8, 22
Title 28, Section 1391 .......... 5, 6
Title 28, Section 1391(a)(1) .......... 6
Title 28, Section 1391(c)(1) .......... 9
Title 28, Section 1406(a) .......... 5
Title 31, Section 3729 .......... 6, 7
Title 31, Section 3729(a)(1)(G) .......... 24
Title 31, Section 3729(b)(4) .......... 13
Title 31, Section 3730 .......... 6
Title 31, Section 3732 .......... *passim*
Title 31, Section 3732(a) .......... 6, 7

Coronavirus Aid, Relief, and Economic Security Act
Division A, Title I .......... 1, 5, 22

Rules and Regulations

California Executive Order No. N-33-20 (Mar. 19, 2020) .......... 3

Federal Rules of Civil Procedure
Rule 8 .......... 12
Rule 9 .......... 21
Rule 9(b) .......... 7, 12, 19, 20, 25
Rule 12(b)(3) .......... 2, 6, 25
Rule 12(b)(6) .......... 2, 6, 8

Other Authorities

*Justice Department Places FDA-Approved Marijuana Products and Products Containing Marijuana Subject to a Qualifying State-issued License in Schedule III, Strengthening Medical Research While Maintaining Strict Federal Controls*, Office of Public Affairs, US Department of Justice, https://www.justice.gov/opa/pr/justice-department-places-fda-approved-marijuana-products-and-products-containing-marijuana .......... 5

# I. INTRODUCTION

In early 2020, the world was shut down, the stock market had plummeted, and most businesses were not sure if they could keep the lights on. To avoid economic disaster, the Government provided a lifeline to small businesses—the CARES Act—in which the Government would provide forgivable Paycheck Protection Program ("PPP") loans so businesses could pay their employees and keep operating through the crisis. In exchange, small businesses were required to use the funds for specific purposes, including payroll and business expenses. This exchange helped the United States to avoid economic disaster of an untold scale.

Laurie Holcomb operated the Gold Flora Companies, four small businesses operating legally in California's heavily regulated cannabis industry. Following California's COVID-19 stay-at-home order, the State of California deemed the Gold Flora Companies essential businesses. They accepted PPP loans and used the funds to pay employees and for other authorized purposes. They were not unique. The Government issued PPP loans to cannabis businesses, including companies whose names expressly included "marijuana" or "cannabis." Despite receiving exactly what it bargained for—PPP funds used to pay workers and buoy the economy—the Government now, six years later, seeks to hold one person liable for payment it welcomed during the height of the pandemic's chaos. The Government declined to prosecute the companies that actually received the loans or the bank that solicited the loans, instead pursuing only Holcomb, the former CEO of the Gold Flora Companies.

The Government's Complaint, however, suffers from fatal defects—both procedurally and on the merits. Venue does not lie in this District. And the Government fails to state a claim because the alleged misrepresentations were immaterial, Holcomb herself was not unjustly enriched, and Holcomb's alleged representations—boxes checked about legal status and technical SBA eligibility—were non-actionable legal representations versus actionable representation of fact.

Moreover, the "reverse false claim" alleged likewise suffers from fatal deficiencies, including no identified duty giving rise to repayment obligation. For these reasons, this case should be dismissed under Rules 12(b)(3) or 12(b)(6) or, in the alternative, transferred to the Central District of California, Santa Ana Division, the district in which Holcomb resides and where the Rule 12(b)(6) motion can be litigated.

## II. FACTUAL BACKGROUND

### A. The Gold Flora Companies are formed and immediately register with the federal Government.

Gold Flora Partners, LLC; GF Distribution, LLC; Gold Flora Capital, LLC; and Black Lion Farms, LLC (collectively the "Gold Flora Companies") were organized between late 2016 and early 2018 under California law and legally operated in the cannabis industry. From formation, the Gold Flora Companies sought to comply with all legal requirements. To do so, the Gold Flora Companies immediately applied for Employer Identification Numbers ("EINs") from the federal Government. The federal Government received, reviewed, and approved each application, providing EINs and permitting the Gold Flora Companies to maintain bank accounts and file tax returns, all necessary to operate in the cannabis industry. Following the Government's approval, the Gold Flora Companies paid taxes to the Government and filed their tax returns. The Government received those tax payments and did not interfere with the Gold Flora Companies' cannabis operations.[1]

### B. COVID-19 shuts down the country, and the Gold Flora Companies are deemed essential businesses to continue operating to "protect the health and well-being of all Californians."

The Gold Flora Companies were still operating in the cannabis industry as small businesses in Costa Mesa, California or otherwise in the Central District of California. In March 2020, COVID-19's disruptive impact was recognized by local and state

[1] This practice is common nationwide, as cannabis companies operate openly with the Government's tacit acceptance. Notably, the Government has never sought to cease the Gold Flora Companies' operations, including since it began its investigation in 2023.

governments. On March 19, California Governor Gavin Newsom issued a state-wide shelter-in-place order, requiring all individuals to stay home. Cal. Exec. Order No. N-33-20 (Mar. 19, 2020). The Order permitted workers in certain critical infrastructure sectors to continue working "in order to protect the health and well-being of all Californians." This included the cannabis industry, which provided essential medicine for many California residents. The California government thus deemed the Gold Flora Companies essential and directed them to remain open during the pandemic. The Gold Flora Companies complied with the state government's directive.

**C. The Government establishes the PPP program, and the Gold Flora Companies avail themselves to PPP funds to keep themselves and their employees afloat.**

While the Gold Flora Companies followed the state government's orders and remained open, they were not immune from the same financial pressures impacting every small business in America. A temporary solution emerged when the Government responded to the pandemic by creating emergency relief programs. In late March 2020, the Government acted with unusual speed to enact the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which established the PPP to help small businesses cover payroll, remain operational, and support the broader economy.

On April 3, 2020, an intermediary working with Celtic Bank communicated with Holcomb about applying for PPP loans. Despite the apparent nature of the Gold Flora Companies' business, the intermediary—an apparent expert in PPP eligibility requirements—raised no eligibility concerns with Holcomb. Nor did Celtic Bank.

Based on the limited availability of this Government lifeline, the Gold Flora Companies submitted four PPP loan applications in April and May 2020—one for each entity—to Celtic Bank to secure funding to pay employees and other permissible expenses before the available funds were exhausted. Each respective application contained a certification stating: "The Applicant is not engaged in any activity that is illegal under federal, state or local law" ("Legality Certification"); and contained a

question asking: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A" ("Ownership Certification"), to which each Gold Flora Company checked "No."[2]

The Government alleges that these certifications were false because the Gold Flora Companies operated a federally illegal cannabis business and Holcomb owned multiple entities. However, aside from the nebulous Legality Certification, the Gold Flora Companies were always open regarding their status as a cannabis business, and the Government allegations counterintuitively rely on this this. *See* Dkt. 22 Complaint in Intervention ("Compl." or "Complaint").[3] Celtic Bank did its diligence and flagged no issues. Before providing a loan, Celtic Bank requested tax forms, reviewed payroll records, and otherwise audited the Gold Flora Companies' business. Yet, despite this transparent and open disclosure of the Gold Flora Companies' status, Celtic Bank solicited the Gold Flora Companies PPP loan business and processed all four loans without issue. In early 2021, the Government forgave the loans, and one of the Gold Flora Companies received a "Second Draw" PPP loan. According to the Government's own Complaint, the Gold Flora Companies were always open and notorious about the character of their business, including prior to receiving the loans.

[2] The Government alleges in a cursory fashion that Holcomb falsely certified eligibility under relevant rules ("Eligibility Certification"), and truthfulness in her certifications. *See* ¶¶ 115–17. These allegations were pled without particularity. To the extent facts underlying the allegations are alleged, they are also fundamentally tied to the Legality and Ownership Certifications. To the extent the Court finds that the allegations are sufficient to sustain independent causes of action (it should not given the cursory nature of the pleadings), those certifications are inextricably intertwined with the Legality and Ownership certifications. The same dismissal arguments apply with full force and effect.

[3] "[T]he Gold Flora Companies declared on their website that 'We are Gold Flora, California's most trusted source for an exceptionally enjoyable, consistent cannabis experience,'" ¶ 16; "[T]he Gold Flora Companies issued press releases that they were one of the few cannabis brands that was both vertically integrated and woman-owned and operated," ¶ 57; and "Holcomb was quoted in at least one press article, in describing the Gold Flora Companies' operations, that, 'All we do is cannabis, seed to sale'; 'We plant the seed, grow the flower and sell it . . ..'" ¶ 106.

Further, at no point is Holcomb alleged to have used the funds for personal gain or for anything other than payroll expenses for American workers.

Notwithstanding the Gold Flora Companies' use of the PPP loans as directed by the CARES Act, three years later the Government turned its attention to Holcomb. Based on nothing more than checking the wrong box, the Government seeks to impose white-collar fraud liability on Holcomb because she operated businesses that were lawful under California law but prohibited under federal law; seemingly ignoring the fact that federal authorities do not—and have not—enforced the prohibition.[4] Yet, on July 8, 2026, well over six years after the Gold Flora Companies initially submitted their initial PPP loan requests, levying no allegation that the Gold Flora Companies used funds for any purpose other than payment of their employees, the Government initiated suit—not against the Gold Flora Companies—but against Holcomb personally, all for allegedly certifying the legality of an operation the Government evidently takes no issue with. Holcomb moves to dismiss this action that should never have been filed in the first place.

## III. LEGAL STANDARDS

### A. Rule 12(b)(3)

Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). "This question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. § 1391." *Atl. Marine Const. Co. v.*

[4]In fact, on April 23, 2026, before the Government filed its Complaint, the Government announced that FDA-approved marijuana products and products containing marijuana would be rescheduled from Schedule I to Schedule III. *Justice Department Places FDA-Approved Marijuana Products and Products Containing Marijuana Subject to a Qualifying State-issued License in Schedule III, Strengthening Medical Research While Maintaining Strict Federal Controls*, Office of Public Affairs, US Department of Justice, https://www.justice.gov/opa/pr/justice-department-places-fda-approved-marijuana-products-and-products-containing-marijuana.

*U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013). Section 1391 provides that, "[e]xcept as otherwise provided by law. . . this section shall govern the venue of all civil actions brought in district courts of the United States." 28 U.S.C. § 1391 (a)(1). Here, law does provide otherwise.

In a False Claims Act ("FCA") action, venue is governed by 31 U.S.C. § 3732 which provides in relevant part: "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be" (1) found, (2) resides, (3) transacts business, or (4) "in which any act proscribed by section 3729 occurred . . ." 31 U.S.C. § 3732(a).

Rule 12(b)(3) provides the framework for challenging venue at the pleading stage and allows for dismissal when venue is "wrong" or "improper." *Atl. Marine,* 571 U.S. at 50. Once venue is challenged under either Rule 12(b)(3) or 28 U.S.C. § 1391, the Court may look to facts outside the pleading, and the burden shifts to the Government to prove that venue is proper. *See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979) ("Plaintiff had the burden of showing that venue was properly laid in" that district); *Argueta v. Banco Mexicano, S.A.*, 87 F. 3d 320, 324 (9th Cir. 1996) ("analysis under Rule 12(b)(3) . . . permits the district court to consider facts outside of the pleadings, and is consistent with the Supreme Court standard for resolving forum selection clause cases").

**B. Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). On the other hand, the Court is "not bound to accept as true a legal

conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to reasonable dispute." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (cleaned up).

Claims under the FCA are subject to the heightened pleading standard of Rule 9(b). *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1054 (9th Cir. 2011). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, the Government must plead the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.,* 356 F.3d 1058, 1066 (9th Cir. 2004)). At the same time, "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## IV. ARGUMENT

### A. Venue is improper because this case has no meaningful connection to the Southern District of California.

The FCA provides that venue is appropriate where "any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Here, the Government filed its Complaint against Holcomb in the wrong district. Holcomb cannot be found, does not reside, does not transact business, and is not alleged to have submitted false claims in the Southern

District. All allegedly false claims were submitted in the Central District where Holcomb can be found, does reside, and does transact business. Thus, the Court should dismiss for improper venue or, in the alternative, transfer to the Central District of California, Santa Ana Division, where Holcomb can renew her Rule 12(b)(6) motion.

**1. Ms. Holcomb cannot be "found" in this District.**

Federal venue statutes—including 31 U.S.C. § 3732 (FCA), 18 U.S.C. § 1965 (RICO), and 15 U.S.C. § 22 (Clayton Act)—commonly authorize suit in any district where a defendant "can be found." Yet the Complaint makes no serious effort to allege Holcomb or the Gold Flora Companies "can be found" in this District. *See* Compl. ¶ 7 (alleging only "Defendants can be found in this district").[5] The Government does not even allege Holcomb is a Southern California resident, instead alleging only that she is a California resident generally. *See id.* ¶ 10 These conclusory allegations as to the "found in" prong of the FCA venue provision are facially defective.

Case law interpreting similar "found in" venue provisions confirms this commonsense reading. For example, courts interpreting the provision in the context of the Clayton Act have found that "[t]he word 'found' within this provision . . . connotes presence and continuous local activities within the district." *Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 291 F. Supp. 252, 255 (E.D. Pa. 1968); *see Amateur-Wholesale Elecs. v. R. L. Drake Co.*, 515 F. Supp. 580, 583 (S.D. Fla. 1981) (The defendant was not "found" in the district absent officers or agents engaged in "continuous local activity."); *cf. King v. Vesco*, 342 F. Supp. 120, 125 (N.D. Cal. 1972) (in the RICO context, "found in" requires "continuity, substantiality or non-episodic character" of contact with the district).

Regardless of the definition used Holcomb is not "found" in the Southern District. She is rarely present in this District, does not conduct business in it, and does

[5] The Government declined to intervene against the "Defendants" it cites to, and the "Defendants" were voluntarily dismissed after never being served. *See* Dkt. 19, 24.

not reside in it. There is no evidence that Holcomb engaged in any continuous, substantial, or non-episodic local activity. As explained below, there is not even evidence that she engaged in the broader "transaction of business" within this District. Therefore, this prong cannot be used to establish venue in the Southern District.

**2. Ms. Holcomb does not reside in this District.**

Under federal law "a natural person . . . shall be deemed to reside in the judicial district in which that person is domiciled." 28 U.S.C. § 1391 (c)(1). "A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return." *Gaudin v. Remis*, 379 F.3d 631, 636 (9th Cir. 2004) (citation omitted). Like the "found in" provision, the Complaint makes no serious effort to allege Holcomb resides in this District. *See* Compl. ¶¶ 7, 10. Nor could it. Holcomb makes her permanent home in Huntington Beach, California. Huntington Beach is squarely within the Central District of California's Santa Ana Division. Therefore, this prong cannot support venue in the Southern District.

**3. Ms. Holcomb does not transact business in this District.**

While there is sparse case law instructing how to interpret the FCA's venue provision for "transacts business in a district," courts within this Circuit evaluating similar venue statutes have held that "[t]ransacting business within a district means conducting business there 'in the ordinary and usual sense . . . of any substantial character.'" *Williams v. Canon, Inc.*, 432 F. Supp. 376, 379 (C.D. Cal. 1977) (quoting *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 373 (1927)) (interpreting analogous language in the Clayton Act). In evaluating the question of "transacting business," courts are charged to substitute "practical, business conceptions for the previous hairsplitting legal technicalities encrusted upon the 'found'-'present'-'carrying-on-business' sequence." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 808 (1948) (evaluating the Clayton Act's venue provisions).

Here, the Complaint does not allege supporting facts, and none of these indicia

actually exist, as to Holcomb. The Government seeks to graft "transact[s] or transacted business" venue in this District by alleging that Gold Flora products were sold at four retail locations in San Diego and Vista. Compl. ¶¶ 16, 53. But the Complaint does not allege that Holcomb, or even any Gold Flora Company, owned or operated any of these alleged dispensaries. It alleges only that Gold Flora products were sold there and that Gold Flora identified the locations to consumers as places where its products could be found. *Id.*

In actuality, the dispensaries were independently owned and operated at arm's length, controlling their own pricing and management without direction from Holcomb or the Gold Flora Companies. Minor Decl. ¶ 3. There were no continuing contractual arrangements requiring these dispensaries to sell Gold Flora products; Gold Flora's identification of the locations merely informed consumers where its products were then available. *Id.* ¶¶ 4-5.

Additionally, Holcomb herself did not maintain an office, telephone number, or mailing address in this District, regularly execute contracts here, or otherwise regularly direct or transact business here. *See id.* ¶ 7. Thus, the Government's venue theory rests only on Gold Flora products reaching independent Southern District retailers. In the same way Pepsi's CEO does not "transact business" in every forum where a gas station or grocery store sells Pepsi products, Holcomb does not transact business merely because Gold Flora products were sold at independent retailers. The downstream sale of those products—entirely unrelated to the PPP applications or alleged false claims at issue—do not establish that the Gold Flora Companies, much less Holcomb personally, "transacts business" in this District. To credit the Government's new expansive theory of "transacts business" venue would be to invite error. *Cf. Le Vecke v. Griesedieck W. Brewery Co.*, 233 F.2d 772, 777 (9th Cir. 1956) (holding that despite shipping product to local distributors in California, an Illinois and Missouri brewery was not transacting business in California sufficient for service of process in venue).

#### 4. Ms. Holcomb is not alleged to have made any false claim in this District.

The Complaint's conclusory venue allegation (Paragraph 7) asserts, as an alternative basis for venue, that Holcomb "performed acts proscribed by the False Claims Act in this district." But that conclusory allegation identifies no facts showing that Holcomb committed any FCA-proscribed act in this District. Nor does the Complaint allege that any conduct underlying the purported FCA violations—namely, the alleged false certifications in the five PPP loan applications and five forgiveness applications—occurred in this District. Accordingly, neither the allegations in Paragraph 7 nor elsewhere in the Complaint satisfy the Government's burden to establish venue under this prong. Further, there are no facts outside the pleadings that would establish any of the disputed conduct occurred in this District. Under either reading, in pleading or in fact, venue in the Southern District is improper.

Thus, because venue is improper in this District, the Court should dismiss the case without reaching the merits or, in the alternative, transfer venue to the Central District of California.[6] Should the Court nonetheless reach the merits, the Court should dismiss the complaint for failure to state a claim, as described below.

### B. All counts must be dismissed because the alleged misrepresentations were not material to the Government.

Under the FCA, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable." *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192 (2016). "Material" means having "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

---

[6] The Ninth Circuit has held that "transfer will generally be in the interest of justice, unless it is apparent that the matter to be transferred is frivolous or was filed in bad faith." *Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015). While the erroneous venue in this case was most likely the result of inadvertence or mistake, and while there is no evidence in the present record of bad faith, whether the Government brought this action here in bad faith or frivolously is a question for the Court.

*Id.* at 192–93. The materiality inquiry looks to the likely or actual effect of the alleged misrepresentation on the Government's payment decision. *Id.* at 193. Importantly, the Government "must also plead their claims with plausibility and particularity under Rules 8 and 9(b) by, for instance, pleading facts to support allegations of materiality. *Id.* at 195 & n.6; Fed. R. Civ. P. 9(b).

Similarly, the common law doctrines of unjust enrichment and payment by mistake, contain independent materiality requirements which are subject to the same heightened pleading standard as FCA materiality. *See United States ex rel. Mei Ling v. City of Los Angeles*, 389 F. Supp. 3d 744, 768 (C.D. Cal. 2019) ("Because the [complaint] adequately pleads materiality with regard to the FCA claims, it does so with regard to the common law claims as well.").

Here, the Government alleges two misrepresentations: The Legality Certification, Compl. ¶ 107–109[7], and the Ownership Certification, Compl. ¶ 110–12.[8] Even taking the Government's alleged facts as true, neither of these alleged false claims were material to payment. As such, they cannot support a cause of action under either the FCA or the common law doctrine of payment by mistake.

**1. The Government has not sufficiently pled that the Legality Certification was material.**

The alleged Legality Certification is vague and overbroad. It does not ask about the nature of the applicant's business, identify cannabis-related activity, or seek any concrete factual disclosure. Instead, it appears to demand a borrower's certification of complete compliance with every federal, state, and local law governing every aspect

---

[7] As explained above, the alleged regulatory compliance certification is intertwined with the Legality Certification. The truthfulness certification is predicated on both the Legality and Ownership Certifications. They fall on the same grounds.

[8] The Government also appears to allege that Ms. Holcomb used funds for improper purpose. *Id.* ¶ 123 ("Holcomb knew at the time she submitted each application for forgiveness of Loan Nos.1-5 that the loan funds were used for purposes other than those specified under PPP Rules.") This is inaccurate and the Government pleads zero factual support for this allegation. Standing alone, this false charge cannot provide a separate FCA basis.

of its operations. Section 3729(b)(4) defines as material any statement "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Notwithstanding the statutory language, the Supreme Court has characterized materiality as a "rigorous" and "demanding" inquiry, and it is one reason why the Government must plead facts to support allegations of materiality. *See Escobar*, 579 U.S. at 181, 195 n.6. This rigorous and demanding standard is not without reason. As the Supreme Court explained:

> The False Claims Act is not "an all-purpose antifraud statute," . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial . . . if the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability.

*Id*. at 194–95 (emphasis added).

*Escobar* rejected the same expansive theory of FCA liability the Government now advances—requiring compliance with the entire U.S. Code and Code of Federal Regulations. Because the Legality Certification also requires compliance with all state and municipal laws, it sweeps even more broadly than the "extraordinarily expansive" theory *Escobar* rejected.

As the PPP is a relatively novel program, and as the Government's theory here is novel, few cases have addressed whether the PPP's Legality Certification can serve as the basis for an FCA action. The most fulsome analysis rejected the theory now advanced by the Government. *See United States ex rel. Animal Legal Def. Fund v.*

*Holden Farms, Inc.*, 2024 WL 2728451 (D. Minn. May 24, 2024) (Tunheim, J.[9]) ("*ALDF*"). In *ALDF*, an FCA *qui tam* action, whistleblower/relator ALDF alleged that the defendant violated the FCA by receiving a $2.5 million PPP loan after falsely certifying the Legality Certification. *Id.* at *1. Allegedly, the defendant, a Minnesota pork producer, ran afoul of this certification by violating animal protection laws and engaging in "animal cruelty, neglect, and instances of 'feedback' feeding, in which pig corpses and byproducts were fed to live pigs." *See id.* Notably, the Government declined prosecution on the false Legality Certification. ALDF pursued the action, and the defendant successfully moved to dismiss on materiality grounds. *See id.*

In deciding the issue, the *ALDF* Court made a few key observations. First, this was "precisely the action the Supreme Court warned against, using an all-encompassing certification of legality to ensnare [the defendant] in FCA liability," and thus, the Court proceeded with "skepticism." *Id.* at *3. Second, in evaluating the totality of the circumstances, the relevant *Escobar* factors were "whether the violated condition went to the essence of the bargain, and the government's response in like cases." *Id.* at *3. Here, like in *ALDF*, these factors weigh against materiality and in favor of dismissal.

**a. The Legality Certification did not go to the "essence of the bargain."**

In evaluating materiality, the Court should look to the essence of the parties' bargain. With respect to the PPP program, the *ADLF* court aptly explained: "The PPP was implemented to support employees and businesses through the early stages of the COVID-19 pandemic . . . and covered a wide range of enterprises, irrespective of their industries." *Id.* at *3. And the PPP's purpose was to "to keep [businesses] and their employees afloat": "As instructed by the purpose of the PPP and [defendant's]

---

[9] Judge Tunheim is the former Chief Judge for the District of Minnesota. His views carry particular weight here given his substantial experience sitting by designation on the Ninth Circuit, including in FCA cases. *See, e.g.*, *United States ex rel. Cain v. Salish Kootenai Coll., Inc.*, 862 F.3d 939, 940 (9th Cir. 2017).

application for the loans, the essence of the bargain was that loans would be issued (and ultimately forgiven) in exchange for businesses using the funds to keep themselves and their employees afloat." *Id.* (emphasis added).

Here, as in *ALDF*, the Government pleads no facts showing that Holcomb used PPP funds for anything other than their intended purposes—"keep[ing] [the Gold Flora Companies] and their employees afloat." *See id.* The Complaint does assert, in conclusory fashion, that the funds were "used for purposes other than those specified under PPP Rules." Compl. ¶ 123. It says no more. The Government does not identify a single allegedly improper expenditure—what was purchased, who received payment, when it was made, how much was spent, which loan funded it, or which rule rendered the expenditure improper. Nor does it allege facts showing that Holcomb enriched herself, pocketed the proceeds, or diverted the funds away from payroll or other permissible expenses. The Government omits these facts because they do not exist.

The Government got exactly what it bargained for. The essence of the PPP bargain was not universal compliance with federal law; it was that businesses would use PPP funds to remain operational and keep their employees paid. That bargain was fulfilled: the Gold Flora Companies stayed afloat and their employees were paid. Just as the animal-welfare violations alleged in *ADLF* were collateral to whether the borrower performed the bargain underlying the PPP, the Gold Flora Companies' alleged violation of the Controlled Substances Act was collateral to whether they used the PPP funds for their intended economic purpose. The Government cannot transform an alleged collateral legal violation into a material one by folding it into an overbroad legality certification. That is precisely what *Escobar* warned against. Therefore, this factor weighs in favor of dismissal.

**b. The Government knowingly issued PPP loans to cannabis businesses.**

*Escobar* identifies two inverse inferences of materiality based on Government conduct. *See* 579 U.S. at 195. First, if "the Government consistently refuses to pay

claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement," that is strong evidence the requirement is material. *Id*. Second, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id*.

In evaluating this standard, with respect to the PPP Legality Certification the *ALDF* court persuasively reasoned as follows:

> [T]here is good reason to believe the government regularly paid similar claims despite knowing that the legality requirement was violated. *See Escobar*, 579 U.S. at 195. The SBA issued approximately 11.5 million PPP loans and forgave 10.6 million. Those loans were issued to "provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program." As such, SBA allowed "lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and ... to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness."
>
> Even under the most ideal circumstances, <u>it is inconceivable that the government would assume that 11.5 million businesses across any number of industries would comply with all governing laws and regulations, no matter how significant</u>. *Cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1730 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[C]riminal laws have grown so exuberantly and come to cover so much previously innocent conduct that <u>almost anyone can be arrested for something</u>."). That proposition is <u>even less conceivable when the government adopted an expedited process that bypassed usual diligence</u>. The government must have known that some loan recipients would run afoul of their broad attestation of legal compliance, yet it still dispersed nearly $800 billion under the PPP with minimal oversight. Under these circumstances, <u>the government did not view as material regulatory violations that technically ran afoul of the loan certification language</u>.

*ALDF* at *4–5 (emphasis added and most internal citations removed).

Here, the *ALDF* court's reasoning applies with full force and effect. The Government delegated oversight, bypassed usual diligence, and dispersed $800 billion dollars. Now, six years later, the Government claims the Gold Flora Companies' Legality Certifications were a material term of the bargain. That is implausible.

The Government has pled nothing beyond conclusory allegations to indicate that it regularly withholds payment from businesses that violate the law—or even from companies that deal in cannabis. To the contrary, Holcomb could identify only one Government enforcement action involving a cannabis company that obtained a PPP loan. *See United States ex rel. Sidesolve LLC v. Docklight Brands, Inc.*, No. 2:22-cv-01371-JNW (W.D. Wash.). The case appears to have settled with no meaningful litigation. This singular pre-litigation settlement does not demonstrate materiality—particularly when juxtaposed with the public record concerning the Government's actual PPP payment and forgiveness practices. Indeed, a review of the judicially noticeable public data on PPP loans reveals that PPP loans were provided to numerous similarly situated businesses. ProPublica's searchable PPP loan database reveals loans made to—and forgiven for—cannabis companies whose involvement in the cannabis industry was strikingly obvious.[10] For example, one borrower left nothing to imagination regarding its industry practice and named itself "A Recreational Marijuana Store, LLC." *See* Aste Decl., Ex. C.[11]

Recipient
A RECREATIONAL MARIJUANA STORE LLC

| Location | Loan Status | Loan Amount | Date Approved |
| --- | --- | --- | --- |
| PORT ORCHARD, WA | Forgiven as of Oct. 21, 2021 | $79,110 | July 29, 2020 |

[10] Holcomb has not independently investigation any of these businesses or whether they in fact violated federal law. That is not her burden. They are merely included to illustrate that a cursory records search reveals the Government paid these claims without any diligence as to legality and cannot now claim materiality.

[11] This declaration is accompanied by a Request for Judicial Notice.

Knowing the applicant was a marijuana/cannabis business, the Government approved the PPP loan and later forgave it. In addition to A Recreational Marijuana Store, LLC, many other business applicants specifically had "marijuana" or "cannabis" in their names. *See* Aste Decl., Exs. A-B. The Government granting and forgiving loans to such companies cannot be squared with its position that operation of a cannabis business was material to payment in the "mine run" of cases. Holcomb operated a small business. Her business, like many other cannabis companies, took PPP loans. The Gold Flora Companies then paid their employees. The Government has already received the benefit of their bargain in this case. The Government made payment in the "mine run" of cases. Because the Government almost certainly paid and forgave PPP loans to many companies engaged in technically illegal activities, including cannabis companies, here, like in *ADLF*, this factor weighs in favor of dismissal.

Thus, as both *Escobar* factors weigh against materiality, neither the Legality Certification nor the Eligibility Certification can support any count of the Complaint.

**2. The Government has not sufficiently pled that Ms. Holcomb's Ownership Certification was material.**

The Government's other alleged false claim is that Holcomb misrepresented her ownership interests in other businesses. This certification mattered because "[a]n applicant that exceeds the applicable SBA size standard after properly including its affiliates' employees or receipts is ineligible for PPP relief regardless of its operational status, organizational form, or pandemic-related financial distress." *United States ex rel. Dunn v. LTC Acct. Servs., LLC*, 2026 WL 800969, at *10 (E.D. Okla. Mar. 23, 2026). Put differently, absent this certification, businesses could divide a single enterprise into nominally smaller borrowers that might each appear eligible for PPP loans, even though the combined enterprise would exceed the applicable size limit. *See id.* at *11. In other words, this certification only materially impacts the bargain when total headcount would exceed eligible numbers, making the business not small.

///

Here, the Government's pleads no facts to demonstrate that Holcomb's Ownership Certifications were material in that way, or in any other way. Instead, the Government alleges that Holcomb's Ownership Certifications were false, but, despite being required to plead materiality with particularity, it pled no facts explaining why that alleged falsity mattered to the Government's decision to pay. *See* 579 U.S. at 195 & n.6. The Complaint does not allege that the Gold Flora Companies were affiliates for purposes of an applicable SBA size standard, identify the applicable size standard, allege the Companies' aggregate employee count or receipts, or allege that aggregating the Companies would have caused any applicant to exceed that standard.

Critically, the Government's theory of ownership misrepresentation is undercut by its own pleading. While the Government alleges Holcomb failed to disclose her ownership in other businesses, the PPP applications themselves disclosed the information the Government claims was concealed. *See* Compl. ¶¶ 60-62, 69-70, 77-78, 85-86, 93-94 (alleging that Celtic Bank processed all loans and that all loans, on their face, identified Holcomb as owner). The Government's complaint really should have alleged that Holcomb forgot to check a box when the information was otherwise disclosed. But that type of mistake would be immaterial, and thus unhelpful to the Government's case. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) ("Innocent mistakes, mere negligent misrepresentations and differences in interpretations are not false certifications under the [FCA]".).

Therefore, although the Government alleges that Holcomb falsely answered the ownership question, Compl. ¶¶ 110-12, it pleads no facts connecting that alleged falsity to the applicants' PPP eligibility. These bare allegations cannot support a claim of materiality particularly under the demanding standard of Rule 9(b). Thus, as none of these alleged false claims were material, all counts must be dismissed.

///

///

### C. Count IV must be dismissed for an independent reason: The Government failed to allege that Ms. Holcomb herself—not the Gold Flora Companies—benefitted from any "unjust enrichment."

Under federal common law, unjust enrichment requires "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *United States ex rel. Quesenberry v. JMG Invs., Inc.*, 2026 WL 453469, at *4 (C.D. Cal. Jan. 14, 2026) (internal quotations and citations omitted). Where, as here, unjust enrichment is predicated on fraud, each of these elements must be pled with particularity per Rule 9(b). *See Puri v. Khalsa,* 674 F. App'x 679, 690 (9th Cir. 2017).

Courts routinely hold that unjust enrichment liability against an individual requires that the individual personally receives the alleged benefit. Importantly, a benefit conferred on a corporation for which the individual works or in which the individual holds an ownership interest is insufficient. *See, e.g., Johnson v. Ross*, 419 F. App'x 357, 362 (4th Cir. 2011) (declining to impose liability where the benefit was conferred on a corporation and incidentally benefited the individual as a shareholder); *Kreidler v. Pixler*, 2010 WL 11527333, at *3 (W.D. Wash. Aug. 3, 2010), *aff'd,* 482 F. App'x 204 (9th Cir. 2012) ("Although the individual defendants received some of the benefits of that coverage, the coverage was ultimately provided to a business enterprise. Absent piercing the corporate veil, which is unnecessary as set forth above, the Court will not hold the individuals liable under an unjust enrichment theory."); *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 958 (N.D. Cal. 2003) ("Similarly, plaintiff's sweeping allegation that Saito as a TeraRecon shareholder received a benefit because of his alleged ownership interest in the corporation fails to state a claim for unjust enrichment.").

Here, the Government has pled no facts showing that the PPP loans conferred any benefit on Holcomb individually. Similarly, the Government fails to plead that Holcomb retained such a benefit. The Government does allege that Holcomb "directly

benefited financially and received monies" and that payments to the Gold Flora Companies somehow "flowed to Holcomb." Compl. ¶¶ 130, 147. However, these allegations lack particularity or factual support in the Complaint. The Government never identifies what Holcomb received, when or how she received it, or what was retained. Despite declining to intervene against the Gold Flora Companies—the entities that actually received the PPP loan proceeds—the Government's allegations simply conflate the Gold Flora Companies' receipt and retention of those funds with Holcomb's alleged individual enrichment. The Complaint appears to recognize this defect by only seeking conditional recovery "to the extent that she personally benefited from the issuance and forgiveness of Loan Nos. 1-5 and retention of funds from such loans." Compl. ¶ 149. Such a conditional pleading without identifying any benefits Holcomb individually received cannot be squared with the particularity requirements of Rule 9. Thus, the Government's unjust enrichment claim must be dismissed.

### D. The alleged Legality and Eligibility Certifications are non-actionable legal representations and, therefore, cannot support an FCA claim.

The FCA provides a cause of action for "false or fraudulent" claims that cause the Government to make payment. But not all claims the Government later alleges were technically false are actionable misrepresentations. As the Supreme Court succinctly stated, the traditional rule is that "misrepresentations of law are not actionable; only misrepresentations of fact are." *United States ex rel. Schutte v. SuperValu*, 598 U.S. 739, 756–57 (2023); *see also Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004) ("It is . . . well settled, as a general rule, that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law."). In the Ninth Circuit, "[s]tatements of domestic law are normally regarded as expressions of opinion which are generally not actionable in fraud even if they are false." *Id.* The Supreme Court has "assume[d] without deciding that the FCA incorporates some version of this rule." *See SuperValu* at 598 U.S. at 756.

Courts throughout the Circuit have demonstrated this concept more concretely. In *Bolos v. Waldorf=Astoria Mgmt. LLC*, Waldorf employees could not sustain a RICO fraud claim based on their employer's alleged willful misclassification of employees because an employee's classification is a "legal representation, which is not an actionable theory of fraud." 762 F. Supp. 3d 975, 1013 (D. Haw. 2025). Similarly, in *Miller*, the Ninth Circuit held that a manager's statement that employees "were not entitled to overtime pay because they were salaried" was not actionable because it constituted a representation of domestic law. 358 F.3d at 621. In *Naoom v. Secured Assets Income Funds*, borrowers could not sustain a fraud claim based on representations that loan documents were compliant with the law because "any representation regarding the legality of the transaction or documents was a representation of law, and as such, not actionable for fraud." 2006 WL 8455409, at *13 (S.D. Cal. Oct. 16, 2006). Likewise, even before *SuperValu* recognized such an FCA defense, the District of Alaska held that representations that contracts were "'legal' under the relevant [federal Energy Savings Performance Contracts] statutes and regulations" were not actionable because "a legal assertion of this type cannot form the basis of an FCA claim." *United States ex rel. Berg v. Honeywell Int'l, Inc.*, 226 F. Supp. 3d 962, 982 (D. Alaska 2016), *aff'd,* 740 F. App'x 535 (9th Cir. 2018).

Here, the Legality Certification and the Eligibility Certification[12] can only be read as statements of domestic law. Indeed, the plain language of each certification confirms that the alleged misrepresentations are ones of law, not fact. Although "the applicant" and the activities in which it engages concern factual matters in some sense, the Government does not allege that Holcomb misrepresented what those activities were. In fact, as discussed above, the Complaint appears to allege Holcomb and the

[12] "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

Gold Flora Companies were quite open about the nature of their business. Rather, the alleged falsity rests (according to the Government's reading) entirely in the certification's characterization of those activities as not "illegal under federal, state or local law" or "eligible to receive a loan under the rules in effect." That characterization requires applying law to the applicant's conduct and reaching a legal conclusion about its legality or how the SBA would evaluate the eligibility under its regulations. *C.f. Berg*, 226 F. Supp. 3d at 982 (finding assertions about the legality of contracts under federal statutes and implementing regulations not actionable as the basis of an FCA claim). Thus, the Government's own pleadings make clear its liability theory does not depend on any false factual statement by Holcomb about what the applicant did; it depends on her allegedly erroneous representation of the Gold Flora Companies' legal status and compliance with federal statutes and SBA regulations.

Such opinion statements about legal effect are not actionable. While it is true that marijuana is a controlled substance, its legality, and, more relevantly, the legality of licensed businesses that deal in it, is by no means simple. Courts throughout the country have recognized this complexity. *See Jensen v. Maryland Cannabis Admin.*, 719 F. Supp. 3d 466, 473–74 (D. Md. 2024), *aff'd,* 151 F.4th 169 (4th Cir. 2025), *cert. denied,* 146 S. Ct. 1626 (2026) (referring to the cannabis industry as "existing in a liminal legal space" and noting that "to say that the legal milieu surrounding cannabis is complex would be an understatement."); *see In re Malul*, 614 B.R. 699, 706 (Bankr. D. Colo. 2020) (describing marijuana legality as a "ever-shifting landscape."); *see United States v. Evans*, 929 F.3d 1073, 1076 (9th Cir. 2019) (noting that "we concluded that DOJ could not spend appropriated funds to prosecute 'individuals who engaged in conduct permitted by the State Medical Marijuana Laws.'" (internal citations omitted)); *cf. United States v. Hemani*, 146 S. Ct. 1677, 1701 (2026) (Alito, J. concurring) (concurring in the unanimous decision that 18 U.S.C. § 922(g)(3) could not constitutionally ban firearm possession based on regular marijuana use and noting

"[i]n these circumstances, marijuana use today is like alcohol use at the founding. It is widespread and increasingly considered socially acceptable in many quarters. And from a practical standpoint, law enforcement widely tolerates the use of marijuana.").

The complexity of these issues certainly augurs poorly for the Government's burden to prove Holcomb's scienter. But the Court need not reach that issue because the Government's legal theory is deficient as a matter of law. Holcomb is alleged to have made an erroneous legal judgment, not a false representation of fact. That is precisely the type of representation that courts throughout this Circuit have held is nonactionable as fraud, which provides an independent legal basis for dismissal of claims predicated on the Legality and Eligibility Certifications.

### E. The Government also fails to plead a reverse false claim (Count III) with particularity, because the Complaint fails to allege a specific legal obligation to pay.

The FCA's "reverse false claim" provision imposes liability for knowingly using a false record or statement to avoid an obligation to pay the Government, or knowingly concealing, avoiding, or decreasing such an obligation. 31 U.S.C. § 3729(a)(1)(G). "The elements of a violation under the first prong of the reverse-FCA provision are that (1) a record or statement was false, (2) the defendant had knowledge of the falsity, (3) the defendant made or used (or caused to be made or used) the false record or statement, (4) the defendant's purpose was to conceal, avoid, or decrease an obligation to pay the government, and (5) the false record or statement was material." *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1055-56 (N.D. Cal. 2020) (citing *U.S. v. Bourseau*, 531 F.3d 1159, 1164-71 (9th Cir. 2008)) "The elements of a violation under the second prong of the reverse-FCA provision are that the defendant (1) concealed or improperly avoided or decreased an obligation to pay the government and (2) did so knowingly." *Id.* at 1056 (citing *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir. 2016)).

Critically, in order to recover, "the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used. The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness." *Bourseau*, 531 F.3d at 1169 (quoting *Am. Textile Mfrs. Inst. v. The Ltd., Inc.,* 190 F.3d 729, 735 (6th Cir. 1999)).

Here, the Complaint fails to plead a reverse false claim because it never identifies an existing legal obligation that Holcomb allegedly concealed, avoided, or decreased. It alleges only that the Gold Flora Companies followed the path the PPP intended— executing promissory notes and later submitting forgiveness applications.

Nor does the Complaint allege that the SBA rescinded forgiveness, made a repayment determination, or otherwise established an existing debt to the Government. Instead, it simply assumes that, because the Government now alleges the borrowers were ineligible, the loan proceeds necessarily became repayable at an undefined (and unpled) date in the past. That allegation is insufficient. The Government pleads that the Gold Flora Companies were ineligible to receive loans. It does not plead that Holcomb personally had a legal obligation to repay the loans the Gold Flora Companies submitted. Nor does it plead the how, when, or under what doctrine such legal obligation attached. This falls short of as required by Rule 9(b)'s heightened particularity requirement. As such, Count III should be dismissed.

## V. CONCLUSION

For the above reasons, Holcomb respectfully requests dismissal under either Federal Rule of Civil Procedure 12(b)(3) or 12(b)(6). In the alternative, Holcomb requests venue transfer to the Central District of California, Santa Ana Division, where venue would be appropriate.

Dated: August 28, 2026 PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Dylan M. Aste*
Paul J. Fraidenburgh
Dylan M. Aste
Francis T. Kalinski
Christoffer Lee

Attorney for Defendant Laurie Holcomb